G. W. Jones et al. v. J. D. Andrews et al.

No. 5626.

1. **Second Suit in Trespass to Try Title.**—In suits pending at the enactment of the Revised Statutes a second suit was reserved in cases pending, and the right to such suit for land exists where in the former suit it does not clearly appear that its object was to establish the boundary lines of lands of the parties.

2. **Suits to Establish Boundary Lines.**—In such cases a second suit could not be brought.

3. **Practice—Reform of Judgment.**—By consent, the court after judgment may reform the judgment and permit plaintiffs to dismiss or remit judgment against one or more of several defendants.

4. **Commencement of Suit.**—The second suit in trespass to try title was filed April 17, 1879. The judgment in the first suit was rendered April 18, 1878. Citation issued May 28, 1879—it not appearing that the plaintiffs directed the delay or did anything to cause it. *Held,* That such delay cannot be chargeable to plaintiffs so as to affect the filing of the suit within one year.

5. **Evidence in Second Action.**—It was proper to exclude evidence offered by defendant solely for the purpose of showing that in the first suit the plaintiff had prosecuted his case upon a different or inconsistent hypothesis in seeking to establish the locality and boundaries of the land sued for. The plaintiff on the second suit is in no way concluded by the testimony upon the first trial.

6. **Inconsistent Calls—Question for Jury.**—Where the calls for the beginning corner of a survey are inconsistent, and the testimony to the locality of the land sued for and of surveys called for in its field notes is conflicting, it is for the jury from the testimony to determine if they can the locality of the land; it is error for the court to designate one point among several testified to as a point from which the survey should be constructed by its calls. The court should not attempt to control the jury in applying the entire testimony to the purpose of identifying the land.

7. **Boundaries—Natural Objects.**—Everything being equal, calls for natural objects would have precedence, because most endurable and less liable to change, and are supposed to be selected as landmarks because of their immutability. This is only true

when they are selected as locative calls, and are then not always absolute. When they are noted in field notes as mere incidental calls in passing, their reliability is weakened and sometimes rendered worthless.

8. Distances in Boundaries, Roads, Creeks, etc.—Distances called for between corners and to creeks or roads, unless specially designated in such manner as to show the intention to make them locative, are not locative, and will not ordinarily have precedence over a call for course and distance.

9. Pre-emption—Limitation.—A pre-emptor can take no benefit from his possession under the statute of limitation of three years.

10. Limitation—Charge.—Where possession with the conditions named in any of the statutes of limitations is proven, and replication of coverture or minority is pleaded and testimony thereto introduced as to one or more of the plantiffs, the court should charge upon the defense and upon the exception.

11. Description of Land in Trespass to Try Title.—It was incumbent upon the plaintiffs to show by reasonably satisfactory evidence where their survey was located, and to furnish the jury data by means of which it could be described. The judgment should contain a description such as would be a guide to the sheriff in executing a writ of possession.

12. Same.—See facts where reversal was had for want of sufficient description of the land sued for.

Appeal from Bastrop. Tried below before Hon. H. Teichmueller.

Andrews and others, appellees, filed their action in trespass to try title April 17, 1879, against appellants, for a tract of one-fourth of a league of land patented in name of Wm. H. Hunt. The land is described as lying "about 14 miles S. E. of the town of Bastrop; beginning at the N. E. corner of survey No. 27, made for Wm. H. Hunt, a post oak, from which a post oak bears S. 26 deg. 30 min. W. 5 varas, marked H, and another bears N. 80 deg. 30 min. E. 26 varas, same mark (this corner is on the S. line of S. Darling league survey and 2700 varas N. 80 deg. W. from his S. E. corner); thence N. 80 deg. W. 2500 varas to a post oak marked H, for the N. W. corner of survey No. 27, from which a post oak bears S. 82 deg. E. 6 varas, marked H; thence S. 10 W. 1150 to Buckman's Creek, runs S. E., at 2500 varas the S. W. corner of survey No. 27 a stake; * * thence S. 80 deg. E. 2500 varas to the S. E. corner of survey No. 27; * * thence N. 10 deg. E. 300 varas to Buckman's Creek 2500 varas to the place of beginning."

October 6, 1879, in a supplemental petition, R. S. McWilliams, A. L. Saunders, and Caton Erhard were made defendants.

The defendants pleaded not guilty, statute of limitations, and suggested improvements made in good faith. October 17, 1879, the plaintiffs, Eugene Flewellin, Bettie McFarland, and Lillie Flewellin, pleaded infancy and coverture to avoid limitation.

The defendant Jones alleged ownership to part of the V. L. Evans (Garret) survey, to 320 acres known as the Stiehl survey, and 749 acres of the Daniel Gray survey. Burleson and wife claimed title under the Stiehl survey. Defendant Mullin claimed 160 acres under the pre-emption laws.

The case was tried, and plaintiffs recovered save as against Saunders and McWilliams. On appeal the judgment for the plaintiffs was reversed and cause remanded.

On October 19, 1885 (after the court below had regained jurisdiction), the defendants filed an amended answer, and also alleging in substance that this suit was not to determine the title to said one-fourth league, but was one of boundary and location only; and that a former suit between plaintiffs and the defendants herein, involving the same issues, had been determined in the court below on the 18th day of April, 1878, in favor of the defendants therein, and that the judgment therein was a bar to the further prosecution of this suit. On the 22d day of October, 1885, plaintiffs filed their exceptions to defendants' pleas of limitation, and also their supplemental petition, claiming rent; and defendants also filed their supplemental answer to plaintiffs' pleas of disability. On the same day the death of Caton Erhard was suggested, and his administrator, A. C. Erhard, appeared and answered. On the 23d day of October, 1885, plaintiffs disclaimed title to that portion of land in conflict between the V. L. Evans or John Garret survey and the W. H. Hunt survey, and also dismissed their suit as to Murray Burleson and S. E. Burleson, and trial was then had and judgment rendered against the defendants, Jones, Yaws, Mullin, Reeder, and A. C. Erhard, administrator. Defendants filed their motion and amended motion for a new trial, pending which the plaintiffs, over the objections of defendants, disclaimed as to the conflict between the Hunt and the Medford surveys, and also as to the said Reeder, and reformed their judgment as to costs.

The defendants' motion and amended motion for a new trial were overruled, and an appeal was by them taken and perfected to this court.

The Hunt survey as well as the territory surrounding it had been surveyed by B. Sims, a surveyor for Austin's Colony. The Austin Colony map, prior to 1836, shows these surveys as follows:

The south line of the S. Darling survey, the only survey called for in the Hunt survey, is east and west; its east line is north and south.    The Hunt calls to begin N. 80 deg. W., 2700 varas from the Darling S. E. corner; yet it in terms is built upon the south line.

The Darling tract was resurveyed before being patented, and its south line placed ―― varas further south than as called for in the original survey.

In 1840, Wallace, the surveyor for Bastrop Land District, resurveyed the Hunt land.    His field notes and accompanying map are here given:

Original field notes of the Hunt survey, returned by the surveyor, William S. Wallace, the 21st day of January, 1840, are as follows:   Beginning at a post oak post, from which a post oak 12 inches in diameter bears south 26½ west 5 varas, and another post oak 9 inches in diameter bears north 80½ east 6 varas, which stands in the south line of S. Darling league, north 80 west 2700 varas from Darling's southeast corner; thence north 80 west 510 varas to old Gonzales road, 2500 varas to the northwest corner, a post oak post, from which a post oak 10 inches in diameter bears south 42½ east 6 varas another 6 inches in diameter bears north 42½ west three varas; thence south 10 west 1150 varas to Buckner's Creek, 2500 varas to the southwest corner, a post oak post, from which a post oak 12 inches in diameter bears south 65 west 9½ varas, and a post oak 6 inches in diameter bears north 23½ east 5 varas; thence south 80 east 915 varas to Gonzales road, 2500 varas to a post oak post; thence north 10 east 300 varas to Buckner's Creek, 2500 varas to place of beginning.

Wallace's map of survey in 1840.

The Stiehl, Gray, and Mullin claims were located long after the patent to the Hunt survey, and upon lands bounded on north by the Darling and V. L. Evans (Garret), west by the Garret and Musgrove Evans, south by the Graham and Latham surveys, and on east by the Medford. (See first map above.)

The V. L. Evans field notes call for the Hunt survey on its N. and W. lines. The Musgrove Evans and the Garret east lines appear in part to coincide with the W. line of the Hunt survey as recognized in the Garret field notes.

The testimony is voluminous. The contest was upon the locality of the Hunt tract. No witness could find the corners as called for. Witnesses testified, that from the northeast corner of the Latham, and running northerly at direction called for, a marked line was found; at about 2500 varas was a *supposed* corner; running east at 2500 varas was found an old marked line parallel with the first, which extended to the Graham north line, where was a corner. This corner on the Graham line was about 200 varas further west than as called for from the southeast corner of the Darling survey.

Miller testified to finding a marked line running N. 80 deg. W. 200 varas north of the original southeast corner of the Darling.

In a map furnished by him is shown the possible locality, from the calls in the Hunt survey, adapted to the Darling, as follows:

A—Supposed corner.
B—Real corner new Darling.
Solid lines found on ground;
dotted lines not found.

Miller further testified, that at about 2500 varas south of the land in dispute the roads and watercourses as called for in the Wallace field notes of the Hunt survey very nearly fitted this survey.

There was no dispute as to title. The opinion sufficiently shows other matters discussed therein.

*J. D. Sayers* and *G. W. Jones*, for appellants. — 1. The former judgment was conclusive. Maddox v. Humphreys, 30 Texas, 494; Hoffman v. Cage, 31 Texas, 595; Veramendi v. Hutchins, 48 Texas, 531; Bird v. Montgomery, 34 Texas, 713; Spence v. McGowan, 53 Texas, 30; San Patricio County v. McClane, 58 Texas, 243.

2. Upon effect of the calls for natural objects in locating the land. Urquhart v. Burleson, 6 Texas, 502; Stafford v. King, 30 Texas, 258; Jones v. Leath, 32 Texas, 329; Hubert v. Bartlett, 9 Texas, 97; Tinsley v. Boykin, 46 Texas, 593; Hearne v. Erhard, 33 Texas, 61; Gettings, lessee, v. Hall, 2d Am. Dec., 502.

3. It was error to permit the amendment of the judgment which had been entered upon the verdict. Rev. Stats., arts. 1351, 1357; Acklin v. Paschal, 48 Texas, 147; Herndon v. Rice, 21 Texas, 455; Bouvier's Dictionary, p. 366.

*Walton, Hill & Walton* and *B. D. Orgain*, for appellees. — Counsel, in their brief, vigorously contended that the record does not show the several errors urged; and the brief is a thorough discussion of the facts. It concludes:

"The law of this case on the facts in evidence has been fairly enforced. While the facts are very voluminous, and cross one another like threads in a spider web, the jury has waded through the mass and brought a clean verdict, that responds to the issues, does substantial justice, and ought not to be disturbed, save for the strongest reasons, based on clear error in giving the law to the jury.

"We ask the affirmance of the case."

COLLARD, JUDGE.—This is a second suit; and the first question presented by the record is, can it be maintained as a second suit of trespass to try title?

The first suit was filed May 11th, 1877, and terminated in a verdict and judgment for defendants April the 18th, 1878. The second suit was filed April 17th, 1879, within one year from final judgment, as required by the statute. Defendants, on the 19th of October, 1885, set up the former judgment as *res adjudicata*, upon the ground as claimed by them that the only question involved in controversy was one of boundary. Both suits were in form of trespass to try title; but if it is found to be true that the sole issue between the parties was to settle their boundary lines,

the plea of *res adjudicata* must prevail. Spence v. McGown, 53 Texas, 30; Bird v. Montgomery, 34 Texas, 713; Corporation San Patricio v. Mattis, 58 Texas, 242.

In the case of Bird v. Montgomery the issue of boundary was made in the pleadings by plaintiff, and was accepted by the defendant, both parties asking the court to fix the disputed boundary. The court did so, and it was held to be *res adjudicata* in another action for the same purpose. In the case of Spence v. McGown the court say it was "originally brought in form of an action of trespass to try title; but in reality, by subsequent *amendment* and agreement of the parties, it became a suit to settle and adjust the boundary line between lots No. 2 and No. 3 in block 13 in the city of Houston." The court decided that a second suit for the same purpose could not be brought after final judgment in the first.

In the case in the 58 Texas Reports, above cited, the court approves the ruling in Spence v. McGown, and held that if the suit was nominally to try title but in fact to settle a disputed boundary, a second suit would not lie.

In the case before us, and in the present suit, Jones, Burleson and Burleson, Yaws, and Mullin pleaded title by the three years' statute of limitation; and Jones also claimed by the five years' statute; and the same parties (or their vendors, as in the case of Burleson and Burleson, who are vendees of Faucett) set up limitation as a bar to plaintiffs' recovery in the first suit. In that suit the court submitted the question of limitation under the three and five years' statutes. There was a general verdict for the defendants, and a judgment "that plaintiffs take nothing by their suit," and that "defendants go hence without day." Before the trial of the second suit, on the day of the trial, the 22nd day of October, 1885, the parties filed an agreement as to evidence, as follows: "1. Title, but neither location nor boundaries of the Hunt survey, admitted in plaintiffs. 2. Titles of defendants, Jones, Burleson, and Burleson, in the V. L. Evans or John Garrett survey, and portions thereof, as claimed by them under deeds duly registered, admitted; also, title of defendant Jones to the Gray and Stiehl certificates, and that such certificates have been duly located and report made thereof to the General Land Office as required by law, admitted; also, that the defendant Mullin has complied with all the requirements of the law in taking out his pre-emption. 3. This agreement shall not be so construed as to affect in any way defendants' defenses under the statutes of limitations, nor their claims for improvements; and plaintiffs reserve the right to show that such locations and surveys under the Gray and Stiehl certificates are void."

The other defendants were left to prove their titles, if they had any. It was proved by parol that Yaws purchased a part of the Stiehl survey, and that Moses Gage purchased some portion of the Gray from Jones.

At what time Gage purchased, or how much land, does not appear. He and Burleson occupied the Burleson place in the southeast part of the Gray, one succeeding the other, making the possession continuous for three years, and both of them claimed in their own right.

Now, it is contended by the appellants that by the foregoing agreement and the developments upon the trial the suit resolved itself into one purely and solely of boundary, and that notwithstanding the form of the action is in trespass to try title the judgment in the first suit is a bar to this suit. We can not agree to the proposition. It can not be determined from the verdict and judgment in the first suit whether the question of boundaries was adjudicated or not as to the parties pleading limitation in that suit. The verdict and judgment were general; the court submitted to the jury the issue of limitation as pleaded, as well as the question of boundary. We have no assurance that the verdict and judgment were not predicated upon limitation. There being no certainty as to which issue the verdict was based upon, we can not conclude that the jury rested it upon boundary, and hence we can not say that the question of boundary has ever been judicially determined.

Mullin, it is true, could not avail himself of the plea of limitations of three or five years, under a pre-emption claim, it not being patented (Clark v. Smith, 59 Texas, 279, and Buford v. Bostick, 58 Id., 64); but the court in the first suit submitted his plea of limitation under the three years' statute, and though it was improperly done, the verdict may have been upon the plea.

As the case is presented we can not say that the plea of *res adjudicata* was sustained as to the defendant Moses Gage. If the facts presented in the former suit were such as to sustain it, this may be shown on another trial.

Plaintiffs dismissed suit and disclaimed all land claimed by them against the Burlesons and remitted judgment against Reeder, which was allowed by the court and judgment entered accordingly. The court had the power to do this or to reform its judgment for cause shown at any time during the term.

The judgment in the first suit was rendered April the 18th, 1878; the second suit was filed April the 17th, 1879; citations did not issue until the 29th day of May, 1879. From this appellants insist that the second suit was not brought within one year from the rendition of the judgment, and therefore was brought too late.

It was not shown that plaintiffs, by instructions to the clerk or by any other means, caused any delay in issuing citations; nor does it appear that they were guilty of any negligence in respect to the issuance of the process. Upon the filing of the petition it was the duty of the clerk to issue citations, and if there was any delay the plaintiffs will not be presumed to be responsible for it. Hoffman v. Cage, 31 Texas, 596; 48 Id.,

531; 30 Id., 494.   The filing of the petition was the commencement of suit so far as it can be affected by the statute requiring second suit to be brought within one year.

Defendants offered in evidence certain plots that had been used by plaintiffs on a former trial, "for the purpose," as stated in the bill of exceptions, "of showing that the location and boundaries as now claimed by plaintiffs was different from the location and boundaries of the Hunt survey as claimed on a former trial." The court excluded the evidence. We do not think the court erred in the ruling. Plaintiffs were not bound by the evidence offered by them on a former trial, nor were they compelled to follow the same methods of establishing their boundaries. Parties are not held to such a strict rule of consistency as contended for by defendants. Misconceiving the effect of evidence offered on one trial, they could repudiate it on another. Defendants did not offer the plots as evidence in themselves tending to establish the disputed boundaries, but merely to show inconsistency of plaintiffs' evidence on two trials. We think the evidence was properly excluded.

Defendants asked the court to instruct the jury as follows: "The plaintiffs seek to recover by constructing the Hunt survey upon the old Darling survey, beginning 2700 vrs. N. 80 deg. W. from the old Darling southeast corner. If this be not an established corner it can be determined only by constructing the Darling survey. To do this the jury must follow the footsteps of the surveyor by beginning on the Austin southeast corner, thence to the Austin corner on the Stewart east boundary line, thence with the Stewart east line to the southeast corner thereof, thence west with the south boundary line of the Stewart 1604 vrs., thence south 10 deg. west 5200 vrs. for the southwest corner of the old Darling, and thence east to the east boundary line of the new Darling, and thence to the place of beginning."

We think the court properly refused the charge. Upon the supposition that the location of the Hunt must be governed by the southeast corner of the old Darling survey, the Hunt might by its calls begin *on* the Darling south line, or 2700 varas north 80 west from its southeast corner. The south line of the Darling runs due east and west. The Hunt calls to begin on the Darling south line north 80 west from its southeast corner. It cannot begin on the line and at the same time at any distance north 80 west from its southeast corner. There is a mistake in this call, which the jury, and not the court, can explain. If the survey is made to begin 2700 varas north 80 west from the southeast corner of the Darling, it would be in an entirely different position from that it would occupy if made to begin on the south line of the Darling. The verdict of the jury could alone elucidate the discrepancy. It was beyond the province of the court to instruct the jury where to begin the Hunt survey, even upon the hypothesis that it could only be located by the position of the southeast

corner of the Darling   Is it correct to confine the northeast corner of the Hunt at a certain distance from the Darling southeast corner?   We think not.   The question should be left to the jury under the evidence.   The jury might locate the Hunt by lines found on the ground at a greater distance from the Darling corner.   There is a marked line found, running the course of the west line of the Hunt, from the Latham northeast corner.   It was traced some 3000 varas from Latham's corner; but Miller says, following the line 2484 varas from Latham's corner, and then running across, south 80 east, he struck another marked line which he traced running the course called for in the Hunt.   He traced the line 2500 varas to a corner in the Graham league.   He did not run the south or fourth line.   The east line of this survey would be 2927 varas from the southeast corner of the Hunt.   In case this survey should be identified as the Hunt survey, actually seen on the ground, and the jury should find it so, the southeast corner of the Darling and the exact distance from it could not be said to control the beginning of the Hunt.   In the confusion and uncertainty of the lines and corners of the Darling, the Hunt, and adjacent surveys, we do not think the Hunt is inexorably bound by the southeast corner of the Darling survey.

The seventh instruction asked by defendants is of the same character as the one just considered.   It was correct to refuse it.   In locating a survey, or a corner, it is not absolutely necessary to follow the calls in the grant as given, that is, in the order given.   It is often necessary to reverse the courses and calls, and by so doing obtain more accurate results than could be had by following the order of the surveyor's field notes.   The jury may have concluded that the method of finding the southeast corner of the Darling, as indicated in the charge asked, was the most trustworthy, but they were not bound to do so.   If the Darling survey was not in fact made upon the ground, as the jury may have concluded from the fact the lines and corners called for could not be found, why should the distances of the west lines have preference over the east line, especially when a discrepancy was found in the west lines?   It was found upon measuring from the southwest corner of the Austin to southeast corner of the Stewart the distance was some 400 varas shorter than in the call of the Darling.   If this should be of controlling force the east line of the survey would be 400 varas short.

Appellants asked the court to instruct the jury that "a call for a natural object, such as a creek, or for an artificial object, such as a well marked and long established public road, will control course and distance, and also the lines of the survey unless such lines are actually marked upon the ground."   This instruction was asked to apply to the testimony of Miller, who made a trial survey some 2500 varas below the Darling south line, where Buckner's Creek and the Gonzales Road would very nearly correspond with the calls in the Hunt for such creek and road.

He said there were no evidences of the survey being the Hunt, other than the partial correspondence of calls for the creek and road. To so locate the Hunt would force it south 2500 varas, entirely away from all its other connections. The charge here asked forcibly illustrates the doctrine, often laid down, that while natural objects and artificial boundaries will generally prevail over course and distance, yet the former will often, from the nature of the case, be compelled to yield to the most inferior call. Everything being equal, the call for natural objects would have precedence, because most endurable and less liable to change, and are supposed to be selected as landmarks because of their immutability. This is only true when they are selected as locative calls, and are then not always absolute; when they are noted in the field notes as mere incidental calls in passing, their reliability is weakened and sometimes rendered wholly worthless. Distances called for between corners to creeks or roads unless specially designated in such manner as to show the intention to make them locative, are not such, and will not ordinarily have precedence over a call for course and distance. The calls in the Hunt for the creek and road are incidental, and unless shown to be intended as locative should not be so regarded if inconsistent with other locative calls. Had the court given the charge asked it would have been error.

Defendant Yaws asked the court to charge the jury upon his plea of three years' limitation. We find there was proof tending to establish the plea; he claimed all the Stiehl location south of the Burleson 200 acres, and proved by parol, without objection, his purchase from Jones in 1875, and possession for more than three years before the suit was brought. The charge certainly should have been given as against the plaintiff Andrews. The plea of disability was established as to the other plaintiffs, and there was, as to them, no occasion to give the charge, though it might have been given with qualification as to disability.

There is only one more question we deem it necessary to consider in this case. It is aptly presented in the following assignment of error: "The verdict of the jury decides nothing; it leaves the case just where it began, with the field notes in the Hunt patent as the only guide to the officer who may be charged with the duty of putting the plaintiffs in possession of the Hunt survey."

This assignment is well taken. The prime object of the whole controversy was to locate the Hunt survey; to determine what land the field notes include, and when found to be judicially established by a judgment, upon which a writ of possession could issue, informing the officer charged with its execution what particular land he is to deliver to plaintiffs. The field notes of the survey, as contained in the patent, are given in the petition; there is a general verdict for plaintiffs, describing no land, and a judgment is rendered for plaintiffs, describing the land as in the petition. This brings us back to the very place we started from; no results are ob-

tained, nothing is determined.    It can not be said that plaintiffs' recovery would embrace all the land claimed by the defendants.    It was incumbent upon plaintiffs to show by reasonably satisfactory proof where their survey was located, and to furnish the jury with data by means of which it could be described.    Had the petition given a description about which there could be no controversy, a general verdict would have been sufficient; then a judgment following the description in the petition would have settled the matter in dispute.    The petition failing to furnish such description, the jury should have been instructed, in case they returned a verdict for plaintiffs, to identify the land by known metes and bounds, if the evidence afforded the means of doing so.    As it is, we have a judgment that can not be intelligently enforced.    The lines and corners of the Hunt are not found on the ground—at least the corners are not found; and though lines are found that to some extent correspond with the Hunt, it would not be contended that such lines have been by this proceeding judicially established as the true lines of the Hunt.    Again, has the S. E. corner of the Darling been established? and must the Hunt begin 2700 vrs. N. 80 deg. W. from such corner, or on the Darling south line, which runs east and west?    A number of such questions might be asked that would show that the sheriff, with the description in the judgment, would be unable to put the plaintiff in possession of any particular land.    One class of evidence places the Hunt in one position, another class in another, and so on.    To enforce the judgment rendered the sheriff must arbitrarily select and locate the land.

Our opinion is, the judgment should be reversed and remanded for a new trial, as to G. W. Jones, T. J. Mullin, Andrew Yaws, A. C. Erhard (administrator of C. Erhard's estate), and Moses Gage.

*Reversed and remanded.*

Adopted June 26, 1888.